UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHRISTOPHER HARDER,

    Plaintiff,

v.

COUNTY OF HURON, et al.,

    Defendants.

_____/

Case No. 16-cv-10312

Honorable Thomas L. Ludington

## **ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

On January 29, 2016, Plaintiff Christopher Harder initiated the above-captioned matter by filing his complaint against Defendants City of Elkton, County of Huron, Officer Adam Csanyi, Deputy Randall Britt, and Deputy Todd Schember. *See* Compl., ECF No. 1. Alleging that Defendants falsely arrested and prosecuted him for assaulting a woman with a gun, Plaintiff Harder claims that Defendants violated his Fourth and Eighth Amendment rights pursuant to § 1983 and committed the torts of false arrest and malicious prosecution. Plaintiff also asserts claims pursuant to *Monell v. Department of Social Services of New York,* 436 U.S. 658 (1978) against Defendants County of Huron and City of Elkton. *Id*.

On January 27, 2017 Defendants Csanyi and City of Elkton filed a motion for summary judgment. *See* Mot. Summ. J. I, ECF No. 26. On January 30, 2017 Defendants County of Huron, Deputy Britt and Deputy Schember filed a separate motion for summary judgment. *See* Mot. Summ. J. II., ECF No. 28. For the reasons stated below Defendants' motions will be granted.

**I.**

Plaintiff Christopher Harder is a resident of the City of Elkton, which is located in Huron County, Michigan. *See* Compl. ¶ 1. Harder was previously married to Maria Redmond, who

also lives in the City of Elkton.  Plaintiff does not dispute that he has felony convictions, and is therefore prohibited from possessing firearms.

At the time of the relevant events, Defendants Randall Britt and Deputy Todd Schember were employed by the Huron County Sheriff's Department.  Defendant Adam Csanyi was one of only two officers employed by the City of Elkton Police Department.

**A.**

The facts giving rise to Plaintiff Harder's lawsuit commenced on February 13, 2014.  On that date, at around 2:49 pm, the Huron County Sheriff's Department received a 911 call from a woman named Erica Sprague, who was calling to report an incident that had just occurred at her apartment, located at 124 Maude Street in Elkton, Michigan. *See* Dispatch Audio Track 1, ECF No. 28-8. Ms. Sprague reported that Plaintiff Harder had just threatened her with a gun and had driven over her foot with a vehicle while exiting her driveway. *Id*.  She further reported that she could not walk. *Id*.  In response, the 911 dispatcher notified Ms. Sprague that he was sending an ambulance and a police officer to her location. *Id*.

When asked by the dispatcher what had caused the incident, Ms. Sprague explained that she, Harder, and Ms. Redmond were in a "tussle" because she had been in the possession of some of Ms. Redmond's property, and that Harder and Ms. Redmond had driven to her apartment in an attempt to retrieve the property.  After Ms. Sprague returned Ms. Redmond's property, she reported that Plaintiff Harder "got in [her] face" and told her to stay away from his family. *Id*.  According to Ms. Sprague, Harder exited his vehicle holding a 9 mm pistol, snatched her phone from her hand, and threw the phone onto the driveway. *Id*.  She reported that Harder held the gun to her face, and when she went to pick her phone up off of the driveway Harder drove over her foot. *Id.* Ms. Sprague initially identified Plaintiff Harder's vehicle as a blue

Blazer, but later clarified that it was an Explorer. Ms. Sprague remained on the telephone line pending arrival of the ambulance and police officer. *Id*. After an ambulance arrived at her location the call was terminated. Ms. Sprague was taken to the Scheurer Hospital.

**i.**

While on hold with Ms. Sprague, the 911 dispatcher contacted Deputy Randall Britt to locate Christopher Harder. *See* Britt Dep. 24, ECF No. 26-2. Within three to four minutes Deputy Britt located a blue Explorer driving rapidly westbound on M-142, about one mile and a half from the Laker High School. *See* Britt Dep. 27-28. Britt ran the license plate and determined that the vehicle was owned by Maria Redmond. He therefore turned on his lights and pulled the vehicle over in the Laker High School parking lot. *Id*. at 32-33. Britt approached the vehicle and informed Harder, the sole occupant of the vehicle, that he was investigating a possible assault with a weapon and hit-and-run as reported by Ms. Sprague. *Id*. at 34-35; Harder. Dep. 165. Britt then searched the vehicle for a firearm pursuant to Harder's consent, but did not locate any weapon. Britt Dep. 35; Harder Dep. 150-51. After Britt finished searching the vehicle Officer Todd Schember arrived in response to a request for backup. Britt Dep. 38.

When asked by Deputy Britt about the incident, Harder explained that he and Ms. Redmond had gone to Ms. Sprague's apartment in order to re-claim some of Ms. Redmond's personal property, and that the women had argued. *Id*. at 36. He maintained that he had remained in the vehicle and had not pointed a gun at anybody. *Id*. Harder also maintained that he had not driven over Ms. Sprague's foot, but acknowledged that she was in the vicinity of the vehicle when he left the driveway. *Id*. at 37. As Britt spoke with Harder, Officer Schember called Ms. Redmond to obtain her version of the incident. When Ms. Redmond's version of the events largely corroborated the version articulated by Harder, the officers informed Harder that he was

free to leave. *Id*. at 39-41. However, according to Deputy Britt, they informed Harder that they were going to continue to look into the incident and would potentially be in contact with him again. *Id*. at 41.

**ii.**

After releasing Plaintiff Harder, Deputy Britt drove to the Scheurer Hospital in order to make contact with Ms. Sprague. *See* Britt Dep. 41-44. Shortly after arriving at the hospital, while waiting for Ms. Sprague to become available, Britt contacted Dispatch and was informed that there had been a witness to the events on Ms. Sprague's driveway. Britt was not given any specific information about the witness. However, Dispatch was referring to a 911 call placed by Gina Heilig around 45 minutes after the incident. In the call Ms. Heilig reported as follows:

Dispatch: Huron County 911.

Witness: Yes, I'm calling because – where I live there's an apartment complex next to me, and I just watched a guy pull a gun on a girl. And I don't want my name brought up at all. I'm down at my mom and dad's house because it like scares the shit out of me.

Dispatch: Wha-what was at the apartment complex?

Witness: A guy – there was two girls that were arguing in the parking lot and then they went inside of the house – inside of the apartment – and then the boyfriend pulled in, and he went inside, and then when they came out the guy got back in his pickup and the girl got back in her – on her side. And the other girl musta said something and the guy got out and pointed a gun at her. A hand gun.

Dispatch: Okay, where was this at?

Witness: It was on Maude Street. Umm, ah, I can't even think of the name of the apartments, they're right next door to me. But I can't think of the name of the apartments – they're all the way down to the end – but, I'm not there right now. I don't want any police pulling in my driveway or anything because I know that there's drugs related.

Dispatch: Okay.

| | |
|---|---|
| Witness: | And so I don't want any police pulling in my driveway to know that I'm, like, telling on them. |
| Dispatch: | Okay, umm, let me get- what's your name ma'am? |
| Witness: | Gina. |
| Dispatch: | Gina, what's your last name? |
| Witness: | Heilig. |
| Dispatch: | Okay. This is in Elkton? |
| Witness: | Yes. |
| … | |
| Dispatch: | Do you know what happened to the guy in the – a – the pickup? The guy and the lady in the pickup? |
| Witness: | Yeah they left. |
| Dispatch: | Okay they left? |
| Witness: | Yeah. |
| Dispatch: | Um could you describe the pickup to me? |
| Witness: | It was – it was a Explorer, and it was like a really light bluish color. |
| Dispatch: | Okay. |
| Witness: | And I know where they live. The other girl… |
| Dispatch: | Did you know who the person was in the Explorer? |
| Witness: | I don't know who the guy is drivin' but I know who the two girls are. |
| Dispatch: | Okay, who are the, umm, two… |
| Witness: | The one girl that lives in the apartment is Erica Sprague. And the other girl that was a passenger in the Explorer was – is Maria Redmond. |

|           |                                                                                                                                                                                                                                                                                              |
|-----------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|           | …                                                                                                                                                                                                                                                                                            |
| Dispatch: | Ma'am, how long ago did this happen?                                                                                                                                                                                                                                                         |
| Witness:  | It was about an hour ago.                                                                                                                                                                                                                                                                    |
| Dispatch: | Okay, okay. I – we've got actually officers on the scene right now, um, with him, and they- they haven't come across a gun. Could you describe what kind of gun it was?                                                                                                                       |
| Witness:  | It was a handgun.                                                                                                                                                                                                                                                                            |
| Dispatch: | Okay. Could you tell what color?                                                                                                                                                                                                                                                             |
| Witness:  | Ahhh, it didn't look black to me. But it was – ya know I was lookin' out my- my bedroom window.                                                                                                                                                                                              |
|           | …                                                                                                                                                                                                                                                                                            |
| Witness:  | Yeah he had it – when he got out it's almost like he had it shoved up his sleeve. Because when he got out, like, it was like in his hand right away, and he had just gotten in, and started pulling away, and then he put it in park quick and got out and he had the gun in his hand. I'm like oh my gawd… |
| Dispatch: | Okay, an – and who did he point the gun at? Was it…                                                                                                                                                                                                                                          |
| Witness:  | Erica.                                                                                                                                                                                                                                                                                       |
| Dispatch: | E-Erica?                                                                                                                                                                                                                                                                                     |
| Witness:  | The lady that lives in the apartment.                                                                                                                                                                                                                                                        |
| Dispatch: | Okay.                                                                                                                                                                                                                                                                                        |

*See* Dispatch Audio Track 16, ECF No. 28-8. While he was not told any specific information about the caller, Britt believed that the existence of an impartial witness raised the legitimacy of Ms. Sprague's original report. *See* Britt Dep. 47. He therefore called Chief Jobes of the City of Elkton police department to turn the investigation over to their jurisdiction. *Id.*

In response to the call, Chief Jobes dispatched Officer Adam Csanyi to the hospital. Csanyi testified that he had been informed only that Huron County was responding to a felonious assault incident regarding Harder and Ms. Redmond. *See* Csanyi Dep. 31. At the time, Plaintiff Harder was already known to Officer Csanyi, who testified that he knew of Harder due to domestic violence complaints made against him in the preceding five to ten years. Harder, on the other hand, testified that Officer Csanyi had regularly intimidated and harassed him by driving by his home, running his name through LEIN to search for outstanding warrants, and, on one occasion, photographing his relatives' cars. *See* Harder Dep. 85-92. After receiving Chief Jobes's call, Csanyi called dispatch, which gave him the name of the witness, Gina Heilig. Dispatch also informed him that Deputy Britt was at Scheurer Hospital with Ms. Sprague.

Officer Csanyi first called Ms. Heilig, who repeated the allegations made in her 911 call. Csanyi Dep. 33-34. She also informed Csanyi that the man with the gun had knocked Ms. Sprague's phone out of her hand and run over her foot when leaving the scene. *Id.* Csanyi asked Ms. Heilig if she would provide a written statement, and she agreed. *See* Csanyi Dep. 71. Ms. Heilig eventually provided Officer Csanyi with the following written statement:

> February 13, 2014
>
> About 2:45 pm, I heard arguing and yelling. I looked out my window and saw Erika Sprague and Maria Redmond yelling back and forth at each other in the apartments parking lot. They went around the side of the apartments where I could not see them but could still hear them. In pulled Maria's light blue Ford Explorer with a driver I had never seen before. He got out and went inside the apartment where I assumed they were inside at this time. I continued to watch and the guy came out and yelled "Let's go" and then I saw Maria saying something to Erika and shaking her head. She got in the vehicle and they started to pull away and then he slammed it in park and got out with a gun in his hand pointing it at Erika (who I could not see). All of a sudden the guy was heading back to the vehicle and Erika was following him with her phone like she was taking pictures or videoing him. He backed up a little and the pulled out and ran over Erika's foot. I only knew that because I heard her yell, "You ran over my foot" as she limped back into the apartment.

> He was wearing a darker Carhartt coat w/a stocking hat & jeans.
>
> His was a hand gun that was silver/grey in color.
>
> I called 911 after about an hour later.

Heilig Statement, ECF No. 26-6 (sics in original).

Csanyi arrived at the hospital about 30-45 minutes after Britt had arrived. *Id.* at 46-48. After Ms. Sprague completed the intake process, Csanyi began questioned her about the driveway incident in the presence of Deputy Britt. Ms. Sprague was also known to Officer Csanyi prior to the driveway incident due to previous civil complaints, and he believed that she had been the subject of a prior complaint of welfare fraud. *See* Csanyi Dep. 20. At the time of the questioning, Deputy Britt testified that Ms. Sprague appeared to be under the influence of opioids. *See* Britt Dep. 50. When questioned, Ms. Sprague stated that Ms. Redmond and Harder visited her apartment to accuse her of stealing purses, food out of the freezer, and some pills, and repeated her allegations that Harder had pointed a gun at her temple and ran over her foot. *See* Britt Dep. 49, Csanyi Dep. 46. Csanyi recalled that her foot appeared slightly swollen and red, and that he took pictures of her foot. *See* Csanyi Dep. 39. Csanyi informed Ms. Sprague that he would need a written statement regarding her allegations. *Id*. at 53.

### iii.

After speaking with Ms. Sprague for around 30 minutes, Officer Csanyi gave her a ride home. *Id*. at 51. On the way, Csanyi and Ms. Sprague met Deputy Britt at the Elkton police department to pick up a blank statement sheet. *Id*. at 51, 55. While at the police station, the officers witnessed Ms. Redmond's blue Explorer drive past, and Officer Csanyi requested that Deputy Britt stop the vehicle while he finished taking Ms. Sprague home. *See* Britt Dep. 52; Csanyi Dep. 55. Britt then conducted an investigatory stop of the vehicle, revealing Harder to be

the driver and Ms. Redmond to be a passenger. Britt Dep. 53; Harder Dep. 174. Britt spoke with Harder and Ms. Redmond for a few minutes before Officer Csanyi returned. Upon returning, Csanyi asked Harder to exit the vehicle and questioned him about the incident. *See* Csanyi Dep. 58. Harder and Ms. Redmond both claimed that Ms. Sprague had broken into Ms. Redmond's home, and denied Ms. Sprague's allegations regarding the driveway assaults. Officer Csanyi then handcuffed Harder and took him to the county jail on a number of charges relating to the driveway incident. *See* Britt Dep. 53; Csanyi Dep. 61, 63-64. Upon arriving at the jail, Csanyi obtained a written statement from Harder. *See* Csanyi Dep. 68.[1]

While Csanyi was taking Harder to jail, Britt accompanied Ms. Redmond to her residence in order to secure a 9mm firearm registered in her name. *See* Britt Dep 54-55. After visually inspecting the weapon, Britt asked Ms. Redmond to provide him with a statement of the incident, which she gave as follows:

> Came home from a dr. app in Saginaw. There was a note on my door from Erica, something like call me as soon as you get home. Chris had taken me to the dr. because I have had a hard time driving due to health issues. I came in the house, my house was disaray. Upstairs and down. I knew, Erica had been here. So I had Chris take me over there. I called her when I got there, I was in a rage, crying, and couldn't catch my breath. I asked her for whatever it was she took from my house. She said she didn't have anything. I said you can either give it to me or I'll call the cops. So she said she would bring it out. And let me search her place. I did just that. I was crying and asking her why over & over. I searched & searched found a few things. Still missing a few. I went and got in the truck and was crying so hard & my stomach hurt. I had make up in my eyes and my head was down. We started to leave and Chris stopped and got out. I wasn't paying attention because he said to me did you tell her she's not welcome back over I just keep crying. He got out to talk to her. I was looking for something to wipe my face and then I seen them close to the truck arguing I got out told him it was enough to get in. I did not witness a gun in his hand, I can't say he did or did not have one I didn't pay attention. She came close to the truck after he got in and told me how sorry she was and she loved me and hated him. We left.

---

[1] The parties have not provided the Court with a copy of Harder's statement.

*See* Redmond Statement, ECF No. 28-12 (sics in original). After about 15 minutes Britt left with the gun and the written statement.

After leaving the jail, Csanyi collected Ms. Sprague's written statement. The statement provides as follows:

> To whom it may concern this whole thing was a misunderstanding for the fact I know Maria has multiple personalities and sometimes forgets things she does and says For Instance she has given me things and not remember two days later what she gave me or she will remember and say she didn't give them two me. When she gets like that I just give it Back without any questions asked. Maria has a lot of issues you can take a look at her doctors report it will explain her different personalities and her sudden outbursts. I Forgive Chris and dont want anything to happen we just need to grow up and and go on with our lifes For any person to pull out a gun and point it at someone Needs anger management. And not to think twice when driving over my Foot. It could have been a lot worse. But there is a God and someone was watching over me. Maria will always Be in my heart even though she cannot control her issues.

*See* Sprague Statement, ECF No. 26-7 (sics in original). Csanyi also visited Maria Redmond's residence, and obtained the handwritten note Ms. Sprague had left on the door. *See* Csanyi Dep. 68-69. He completed an incident report the following day, on February 14, 2014. *See* Incident Report, ECF No. 26-4.

**B.**

Plaintiff Harder's preliminary examination took place on June 27, 2014. *See* Pre. Exam Hearing Tr., ECF No. 26-5. Appearing on behalf of Plaintiff Harder was Attorney Andrew Lockard, who was assisted by Attorney Kessler. *Id.* at 3. During direct examination, Ms. Sprague reasserted her allegations that Harder had driven over her foot and appeared to be holding a silver handgun. *Id.* at 37. However, as she continued to testify she increasingly backed off these allegations and claimed a lack of memory. *Id.* at 38-39, 44, 48. She also testified that she had not wanted to prepare a written statement for the Elkton Police Department. *Id.* at 42-43. At one point, however, Ms. Sprague mentioned that Harder's attorney had warned her

that if the case proceeded she could incur a charge of breaking and entering, which could result in a sentence of up to 15 years. *Id*. at 38. She admitted that this possibility may have affected her memory. *Id*. She also testified that she was probably intoxicated at the time of the incident, and that the tests she underwent at the hospital revealed opiates and benzodiazepines in her urine. *Id*. at 45. The Court also heard testimony from Ms. Heilig, whose testimony corroborated her earlier reports, and Deputy Britt.

After the completion of the testimony, the Court determined that the Government had met its burden of establishing probable cause through the introduction of competent evidence. *Id*. at 61. The court explained that it had found Ms. Heilig's testimony compelling regarding Harder's possession of a concealed firearm, and that her description of Harder was corroborated by Deputy Britt. *Id*. at 61-62. While noting that Ms. Sprague was a reluctant witness, the court found that her testimony and her prior written statement corroborated the testimony of Ms. Heilig regarding the alleged assault with a firearm, and that her testimony established probable cause that Harder had interfered with her attempt to call 911 by throwing her phone on the driveway. *Id*. at 62-66. The court therefore ordered that Harder was to be bound over on all six charges set forth in the criminal complaint. *Id*. at 66.

Plaintiff Harder proceeded to a jury trial in January of 2015. After the close of proofs, a jury returned a verdict of not guilty on all counts. Harder responded by filing the present suit. In his complaint Plaintiff asserts the following six counts: (1) Illegal detention, seizure and arrest in violation of the Fourth Amendment pursuant to § 1983 as to all Defendants; (2) Malicious prosecution in violation of the Fourth Amendment pursuant to § 1983 as to Defendants Britt and Csanyi; (3) Common law false imprisonment as to all Defendants; (4) Malicious prosecution as to Defendants Britt and Csanyi under Michigan Compiled Law 600.2907; (5) § 1983 Municipal

liability under *Monell*, as to Defendant City of Elkton; and (6) § 1983 Municipal liability under *Monell* as to Defendant County of Huron. *See* ECF No. 1.

## II.

The City of Elkton Defendants and the Huron County Defendants now move for summary judgment as to each of Plaintiff's claims. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The opposing party may not rest on its pleadings, nor "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (internal quotations omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251-52.

## A.

In each of their motions for summary judgment, Defendants argue that Plaintiff cannot proceed on his claims of false arrest or malicious prosecution because the state court judge's finding of probable cause serves as a *res judicata* procedural bar. False arrest claims under both

federal law and state common law require a plaintiff to prove that the arresting officer lacked probable cause. *See Voyticky v. Vill. of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005); *Lewis v. Farmer Jack Div., Inc.*, 327 N.W.2d 893, 894 (Mich. 1982). Similarly, a plaintiff raising a claim of malicious prosecution under either federal or state law must demonstrate that probable cause for the prosecution was lacking. *See Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010); *Walsh v. Taylor*, 689 N.W.2d 506, 517 (Mich. Ct. App. 2004). Where a plaintiff had a prior opportunity to litigate the existence of probable cause – e.g. through a preliminary hearing – a judicial determination that probable cause exists has preclusive effect unless there is evidence that the officer supplied false information to establish probable cause. *See Peet v. City of Detroit*, 502 F.3d 557, 566 (6th Cir. 2007); *Hinchman v. Moore*, 312 F.3d 198, 202 (6th Cir. 2002).

In response, Plaintiff argues that the state court determination of probable cause should not be given preclusive effect because Officer Csanyi's report omitted information regarding Ms. Sprague's intoxication at the time of the incident and her criminal history, and did not highlight the fact that Ms. Heilig observed the events from over 250 feet away and did not immediately call 911. These arguments are without merit, as Plaintiff cannot show that these alleged omissions in Csanyi's report were material to the judicial determination of probable cause. *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003). At the preliminary hearing Ms. Sprague herself testified that she was intoxicated at the time of the incident and that her urine tested positive for opiates and benzodiazepines. Pre. Hearing Tr. 45. Ms. Sprague also testified that she owed Ms. Redmond money for pills, and that she understood she could incur a charge of breaking and entering arising out of the incident. *Id*. at 36, 38. Similarly, Ms. Heilig testified that she observed the events from a distance and that her view was partially obstructed, and she was extensively cross-examined on these issues. *Id*. at 6, 10-14. She also testified that she

waited around 45 minutes before reporting the incident to 911. *Id*. at 8, 15. Plaintiff therefore has not demonstrated that any materially false statements or omissions by the officers supported the judicial determination of probable cause at the time of the preliminary examination. Issue preclusion thus applies, and Plaintiff cannot relitigate the existence of probable cause. The fact that a jury later determined that Harder was not guilty applying the "beyond a reasonable doubt" standard has no bearing on the state judge's prior determination that Defendants satisfied the lesser, probable cause standard.

**B.**

Because Plaintiff cannot show that probable cause was lacking, he has not met his burden of demonstrating that the individual Defendants falsely arrested or maliciously prosecuted him under either state or federal law. He therefore has not shown that the individual defendants committed any constitutional tort, and, as such, cannot establish that a policy or custom of the City of Elkton or the County of Huron was the driving force behind any constitutional injury under § 1983. *See Monell*, 436 U.S. at 690. Plaintiff thus cannot proceed on his claims of municipal liability against either the City of Elkton or the County of Huron.

**III.**

Accordingly, it is **ORDERED** that Defendants' motions for summary judgment, ECF Nos. 26, 28, are **GRANTED**.

It is further **ORDERED** that Plaintiff's complaint, ECF No. 1, is **DISMISSED with prejudice.**

Dated: April 13, 2017
s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 13, 2017.

          s/Michael. A. Sian
          MICHAEL A. SIAN, Case Manager